UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  05-CV-11002-PBS

_____
                                                      )
HUB FOLDING BOX COMPANY, INC.       )
     Plaintiff,                                    )
                                                      )
v.                                                    )
                                                      )
CHARLES JACQUIN ET CIE, INC.,             )
     Defendant.                                 )
_____)

## DEFENDANT CHARLES JACQUIN ET CIE, INC.'S MOTION FOR LEAVE TO FILE COUNTERCLAIMS

     Defendant, Charles Jacquin et Cie, Inc. ("Defendant"), hereby moves, pursuant to Fed. R. Civ. P. 13, for leave to file the counterclaims which are annexed hereto as Exhibit A.

     As grounds to this motion, Defendant states as follows:

     1.     Plaintiff Hub Folding Box Company, Inc. ("Plaintiff"), by a Complaint dated April 7, 2005, alleged claims of breach of contract and violation Mass. Gen. Laws c. 93A, § 11, against Defendant.  Plaintiff filed this Complaint in Bristol Superior Court.  On or about May 16, 2005, the case was removed to the United States District Court for the District of Massachusetts.

     2.     On July 26, 2005, the parties appeared before Judge Saris for a scheduling conference, at which Judge Saris issued a verbal order that, among other things, Defendant file any counterclaim(s) by September 1, 2005.

     3.     In accordance with Judge Saris' July 26, 2005, order, Defendant now requests leave to file the counterclaims which are annexed hereto as Exhibit A.

     WHEREFORE, Defendants respectfully request that they be allowed to assert the proposed counterclaims.

Respectfully submitted,

| | |
|---|---|
| | **DEFENDANT**<br>**CHARLES JACQUIN ET CIE, INC.,**<br><br>By its attorneys,<br><br>  /s/ Jennifer Yen<br>Leigh-Ann Patterson Durant (BBO No. 561901)<br>Jennifer H. Yen (BBO No. 650594)<br>Juan A. Concepcion (BBO No. 658908)<br>NIXON PEABODY LLP<br>100 Summer Street<br>Boston, MA 02110<br>(617) 345-1000 |
| | |
| Dated: September 1, 2005 | |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO:  05-CV-11002-PBS

---

|  |  |
|---|---|
| HUB FOLDING BOX COMPANY, INC., | ) |
|     *Plaintiff*, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CHARLES JACQUIN ET CIE, INC., | ) |
|     *Defendant*. | ) |

---

### DEFENDANT CHARLES JACQUIN ET CIE, INC.'S
### COUNTERCLAIMS AND JURY DEMAND

Pursuant to Fed. R. Civ. P. 13 and 15, Plaintiff-in-Counterclaim/Defendant Charles Jacquin et Cie, Inc. ("Jacquin") asserts the following counterclaims against the Defendant-in-Counterclaim/Plaintiff Hub Folding Box Co., Inc. ("Hub").

## COUNTERCLAIMS

### I.  Introduction

This lawsuit arises out of an order that Jacquin, America's oldest cordial producer, placed with Hub in March 2004 for the manufacture and delivery of cardboard packaging and certain promotional items for Jacquin's 2004 Holiday Gift Set featuring its premier product "Chambord Royale de France."  To Jacquin's chagrin, Hub failed to produce goods in conformance with the parties' agreement, failed to deliver goods according to contractual deadlines, and misrepresented its ability to meet its contractual obligations.  As a result, Jacquin incurred monetary damages, lost profits and injury to its jealously guarded and highly valuable brand image and trademark for "Chambord Royale de France."  Jacquin now seeks recovery from Hub

based on claims for breach of contract, breach of warranty, breach of implied covenant of good faith and fair dealing, misrepresentation and violation of G.L. ch. 93A.

## II.  Parties

1.     The Plaintiff-in-Counterclaim is Defendant Charles Jacquin et Cie, Inc., a corporation with its principal place of business in Philadelphia, Pennsylvania.

2.     The Defendant-in-Counterclaim is Plaintiff Hub Folding Box Co., Inc., a Massachusetts corporation with its principal place of business in Mansfield, Massachusetts.

## III.  Facts

### A.     Jacquin's 2004 Holiday Gift Set Featured Chambord Royale de France and "The Art Of The Cocktail" Theme.

3.     Established in 1884, Jacquin holds the distinction of being America's oldest cordial producer.  In addition to its principal office in Philadelphia, Pennsylvania, Jacquin has offices and facilities in Chambord, France and Guangdon, China.

4.     Jacquin's premier product, Chambord Royale de France ("Chambord"), is a delicate and aromatic black raspberry liqueur manufactured in the Chambord region of France. Made in accordance with a 300 year old tradition, Chambord has been the timeless toast of the French elite since the time of King Louis XIV, when the nobility of France journeyed to his great chateau to enjoy feasts crowned by this and other elegant liqueurs.

5.     From its noble beginnings and throughout its rich French history, Chambord has achieved status as a world-class liqueur enjoyed by the world's most discriminating tastes.  It is one of the top imported French liqueurs in the world.  The same family has owned and produced Chambord for generations.  Each successive son has passed down a passion for premier quality and taste that has remained unchanged from the very beginning.

6.      That same passion and commitment to world-class excellence carries through in Jacquin's marketing and promotional efforts for Chambord.  Everything from the design of the bottle to the label to the type face to the packaging must exude the "Chambord" quality, reinforcing the brand attributes that consumers have come to expect from this world-class liqueur.  Jacquin's annual Holiday Gift Set promotion was no exception.

7.      Each year, Jacquin promotes a unique Holiday Gift Set featuring Chambord, as well as various value-added promotional items at no additional cost to consumers.  Its 2004 Holiday Gift Set theme was "The Art of the Cocktail."

8.      This Gift Set featured a bottle of Chambord, plus four value-added gift items: a cocktail shaker, a jigger measure, a long-handled spoon, and cocktail recipe book.  Jacquin designed the Gift Set to have elegant and sophisticated packaging, with detailed art work reflecting "The Art of the Cocktail" theme.  The packaging was to consist of a tall, rectangular-shaped box with a transparent window on the front which would allow customers to view the contents.  A molded tray base would go in the bottom of the box to hold the Chambord and various gift items in place.  Since the Gift Sets were being assembled in France, where Chambord was manufactured, the packaging would need to be strong enough to withstand the ordinary stresses of international shipping, stacking, and storage in warehouses while awaiting distribution.

**B.      Hub Induced Jacquin To Leave Its Chinese Vendor By Promising High Quality Packaging And A Firm Delivery Schedule**

9.      For a number of years, Jacquin had been using a vendor in China to produce the cardboard packaging for its Holiday Gift Sets.  The Chinese vendor provided Jacquin with high-quality packaging at a competitive price.

10.     In early 2004, Hub, a Massachusetts-based manufacturer of cardboard packaging, approached Jacquin and made a pitch for its business. At first, Jacquin was reluctant to switch vendors, but Hub was persistent in its marketing efforts.

11.     To induce Jacquin to switch vendors, Hub made a series of promises and representations with regard to Hub's ability to provide Jacquin with on-time, high quality packaging for Jacquin's Gift Sets. First, knowing that the packaging had to exude the premier "Chambord" quality, Hub reinforced this brand attribute in its representations and promised to produce a higher quality package with sharper images than the Chinese vendor. When Hub made this representation, it knew that the packaging had to not only look good, but also be strong enough to withstand the ordinary stresses of international shipping and subsequent stacking and storage in warehouses. Hub promised its packaging would have such strength, without needing any additional padding, supports, or reinforcements in the shipping case container. Although Hub's packaging was more expensive than the Chinese packaging, Hub promised Jacquin that the improved packaging quality justified the higher cost.

12.     Second, Hub represented that if Jacquin switched vendors in March 2004, Hub could produce its packaging in time to meet Jacquin's delivery deadlines for the 2004 holiday season. Jacquin explicitly informed Hub of the delivery schedule's importance and explained to Hub that workers in the Chambord facility in France had to assemble the Holiday Gift Sets by hand, a time-intensive process. The summer months of July and August typically constituted the "off-season" for Chambord production. Jacquin took advantage of this down-time by having French workers undertake the laborious task of assembling the Holiday Gift Sets. Like clockwork, the completion of the Gift Sets would coincide with the early fall shipping deadlines for distributors who, in turn, had to meet retailers' fall shipping deadlines for the holiday season.

Jacquin told Hub that if Hub made late deliveries, it would have a domino effect on the rest of the delivery deadlines.  Hub promised it could and would meet its delivery commitments.

13.     Based on these and other representations by Hub, Jacquin switched from its previous Chinese vendor to Hub and entered into a purchase order with Hub, a copy of which is attached as Exhibit 1.

### C.     <u>Terms of the Purchase Order</u>

14.     Pursuant to their agreement, Hub was responsible for these portions of the Gift Sets:

- Cardboard carton (a tall, rectangular-shaped carton with a transparent window on the front; Hub would manufacture these);
- Thermoform support (Hub would manufacture these);
- Thermoform tray (to fit in the bottom of the box and hold the items in place; Hub would manufacture these);
- Jigger (to measure the amount of liqueur poured for a cocktail; Hub would secure these from another vendor); and
- Long-handled spoon (to mix the cocktail; Hub would secure these from another vendor).

All of these items were to be delivered to Chambord's facility in France, where workers could hand assemble the Gift Sets.

15.     Pursuant to their agreement, Jacquin was responsible for these parts of the Gift Sets:

- Chambord – 375 ML and 750 ML (Jacquin would produce this);
- Cocktail shaker with Chambord logo (Jacquin would acquire these from another vendor); and
- Cocktail recipe booklet (Jacquin would acquire these from another vendor).

16.     Pursuant to their agreement, Hub made the following delivery commitments:

a.  Cartons and thermoform pieces:
- 1/3 to be delivered to France by July 1, 2004;
- 1/3 to be delivered to France by July 22, 2004; and
- 1/3 to be delivered to France by August 16, 2004.

     b.  Jiggers and spoons:
- 1/2 to be delivered to France by July 1, 2004; and
- 1/2 to be delivered to France by August 1, 2004.

17.     The parties' structured their payment schedule so that it was tied to Jacquin's shipment of the Gift Sets to distributors. Jacquin explained to Hub that it wanted this structure for a specific reason – from a cash flow standpoint, once the Gift Sets were shipped to distributors, Jacquin could then borrow against these receivables and pay Hub. Hub agreed to this structure.

18.     The parties' agreed-upon payment schedule consisted of:

- $33,000 – when purchase order placed (i.e., March 26, 2004);
- $66,000 – on July 27, 2004 (after 2/3 of cartons and thermoform pieces and ½ of jiggers and spoons had been delivered);
- $66,000 – on August 10, 2004 (after balance of jiggers and spoons had been delivered);
- $300,000 – on September 14, 2004 (after balance of cartons and thermoform pieces had been delivered); and
- $195,000 – on October 12, 2004.

**D.    Hub Failed To Meet Contractual Deadlines and Failed To Produce Conforming Goods, All To The Detriment Of Jacquin And The Chambord Brand And Trademark.**

19.     Despite Hub's promises of high-quality products and timely delivery, Hub failed to deliver goods according to contractual deadlines, failed to produce conforming goods, and misrepresented its ongoing ability to meet its future contractual obligations. After these issues began manifesting, they compounded and had a spiraling and detrimental effect on Jacquin and the Chambord brand and trademark.

20.     The parties had numerous dealings and communications during the six month period of the time of performance (i.e., April 2004 through September 2004), many of which were, of necessity, set forth in faxes and emails due to the language barrier and time differences between Massachusetts-based Hub and Jacquin's facility in France.

### 1. <u>Hub Repeatedly Missed Contractual Deadlines</u>

21.     Despite Hub's promises of timely delivery, delays occurred both in its delivery of the packaging and the gift items.  This significantly delayed Jacquin's assembly process.

22.     With respect to the packaging, Hub failed to deliver any of the three installment shipments of the cartons and the thermoform pieces on time.  Numerous factors caused these delays, including but not limited to the following: first, Hub was late in its manufacturing of the cartons and thermoform pieces.  Second, Hub filled out the Customs forms for the cartons and thermoform pieces, as well as the spoons and jiggers, (which had been sent to France by sea freight) incorrectly, thereby tying up the shipment in Customs for some time.  Third, Hub failed to forward all the necessary paperwork to Jacquin so Hub's freight forwarder in France could release the shipment to Jacquin.  *See* Exhibit 2, Fax from Laetitia Queron of Chambord to Stephen Birmingham of Hub, dated July 22, 2004.  Fourth, Hub's freight forwarder in France was late in its transportation of the shipment to Jacquin's facility for assembly.  *See* Exhibit 3, Fax from Ms. Queron to Mr. Birmingham, dated July 22, 2004.  All the while, Hub kept promising Jacquin it would take care of these problems and assured Jacquin that future installment shipments would not be delayed, a promise it could not, and did not, keep.

23.     With respect to the gift items for which Hub was responsible (i.e., the jiggers and spoons), both installment shipments were late, which delayed the assembly process.  *See* Exhibit 4, Fax from Ms. Queron to Mr. Birmingham, dated July 22, 2004.  After the first late installment, Hub promised to take care of the problems, but did not.  The problems continued. *See* Exhibit 5, Fax from Claude Kistner of Chambord to Robert Cooper and Mr. Birmingham, dated September 22, 2004.

24.    In addition to failing to deliver them on time, some of the packaging and gift items were non-conforming to the contractual requirements and/or outright defective.

### 2.    Hub Failed To Manufacture And Deliver Conforming Goods

25.    With respect to packaging, Hub manufactured the cartons from a paperboard material that was thinner than the cardboard used by Jacquin's Chinese vendor.  Because it was thinner, it was inferior in strength.

26.    In the past, Jacquin shipped its Gift Sets in shipping containers with 6 Gifts Sets per container.  While in the shipping container, the sides of the Gift Sets fit snugly next to each other, forming a grid of sorts which provided additional support to the top and bottom of the shipping container.  This additional support prevented the center of the shipping container from collapsing during shipment or as it was stacked in a warehouse.  Accordingly, Gift Sets arrived safe and sound, without any packaging getting crushed or any contents becoming disheveled.

27.    The paperboard packaging used by Hub was not as strong as the cardboard packaging used by Jacquin's Chinese vendor. Consequently, when the Gift Sets were placed in the shipping containers – the precise kind of shipping containers that Jacquin had used in the past – the thin paperboard provided no support to the top and bottom of the containers.  The center of many of the containers caved in during shipping and while being stored in warehouses.  The Gift Sets arrived at retailers' establishments in inferior and damaged condition, and did not exude the world-class excellence or "Chambord" quality that customers had come to know, love and expect from this brand.

28.    With respect to the thermoform tray pieces, a number of manufacturing defects manifested themselves during the assembly process and/or after the shipping and storage process.   Hub manufactured some of the trays without a slot for the spoon, so there was no way

to secure the spoon in the carton.  *See* Exhibit 6, Fax from Mr. Kistner to Mr. Cooper, dated

August 16, 2004.  Some of the trays had slots which were too loose to hold the spoons and other

items, which allowed them to become dislodged during the shipping and storage process,

resulting in Gift Sets arriving at retailers in a disheveled and unflattering state.

29.    With respect to the gift items themselves, a good number of the spoons were

defective.  They were not of uniform width and therefore, did not fit into the slots in the

thermoform tray pieces.  *See* Exhibit 6.

30.    As a result of late deliveries, non-conforming products, defects in products,

misrepresentations, and other actions and inactions of Hub, Jacquin did not receive what it

bargained for, what it paid top dollar for and what it was repeatedly promised by Hub.  Jacquin's

2004 Holiday Gift Set fell far short of exuding the world-class excellence or "Chambord" quality

that customers had come to know, love and expect from this brand, much to the chagrin,

disappointment and financial detriment of Jacquin and the Chambord image and trademark.

## COUNT I
## Breach of Contract

31.    Jacquin restates and incorporates herein by reference the allegations set forth in

the above Paragraphs.

32.    Hub and Jacquin entered into a valid and legally-binding contractual relationship.

33.    By the conduct described above, Hub breached its contract with Jacquin by failing

to act in accordance with and failing to perform its duties pursuant to said contract.

34.    As a result of Hub's breach, Jacquin sustained damages, including, but not limited

to, lost revenues, additional storage costs, and damage to its brand image, trademark and

reputation in the market.

## COUNT II
## Breach of Warranty

35.     Jacquin restates and incorporates herein by reference the allegations set forth in the above Paragraphs.

36.     As described above, Hub was, at the time the parties' entered into their agreement, and still is in the business of selling packaging for promotional items.  Hub represented to Jacquin that the packaging and promotional items for Jacquin's Gift Sets would be fit for the  particular use and purpose of marketing, sales and promotion of the Chambord product.

37.     Hub produced a product that was not suitable for such ordinary use.  Hub packaged the Gift Sets in a defective manner, resulting in damage and destruction to many of such Gifts Sets.  This defect in Hub's packaging existed at the time the product left the Hub's hands so that it was not reasonably suitable for the ordinary uses for which goods of that kind were sold.

38.     As a result of Hub sending out Jacquin's Gift Sets in defective packaging, Jacquin sustained damages, including, but not limited to, lost sale profits and revenues and injury to its reputation on the market.  At the time of  injury, the product was being used in a manner that Hub intended or that could reasonably have been foreseen.  The defective packaging constituted the legal cause of Jacquin's injuries.

39.     As a result of Hub's said breach of warranty, Jacquin sustained damages.

## COUNT III
## Breach of Implied Duty of Good Faith and Fair Dealing

40.     Jacquin restates and incorporates herein by reference the allegations set forth in the above Paragraphs.

BOS1523510.1

- 11 -

41.     Hub owed a duty to Jacquin to act in accordance with its implied duty of good faith and fair dealing in conducting itself under their agreement.

42.     Hub breached its duty of good faith and fair dealing by the conduct described above, including, but not limited to, misrepresenting its abilities to deliver conforming goods according to contractual deadlines, misrepresenting the state of affairs to Jacquin, and inducing Jacquin to refrain from securing cover from alternate sources with empty promises of performance.  In this manner, Hub destroyed Jacquin's right to obtain its bargained-for benefits under the parties' agreement and acted dishonestly.

43.     As a result of Hub's breach of the duty of good faith and fair dealing, Jacquin suffered damages.

## COUNT IV
## Misrepresentation

44.     Jacquin restates and incorporates herein by reference the allegations set forth in the above Paragraphs.

45.     As described above, Hub made a series of knowingly false statements to Jacquin.

46.     Hub made said false statements with the intent to deceive Jacquin.

47.     Hub's false statements to Jacquin were material to Jacquin's decision to use Hub for the packaging and distribution of their Holiday Gift Sets and not to seek alternative vendors.

48.     As a result of Hub's misrepresentations, Jacquin suffered injury and damages.

## COUNT V
## Violation of G.L. ch. 93A

49.     Jacquin restates and incorporates herein by reference the allegations set forth in the above Paragraphs.

50.     Through the wrongful conduct described above, Hub has engaged in unfair and deceptive acts in trade and commerce in the state of Massachusetts.

51.     Hub made the above-described misrepresentations and breaches of contract and warranty knowingly and willfully.

52.     As a result of Hub's unfair and deceptive conduct, Jacquin has sustained damages.

## DEMAND FOR JURY TRIAL

Jacquin demands a trial by jury on all claims and issues raised in its Counterclaim, as well as the Complaint, so triable, and on all defenses asserted thereto.


WHEREFORE, Jacquin respectfully requests this court to grant the following relief:

1.  Enter judgment in favor of Plaintiff-in-Counterclaim/Defendant Charles Jacquin et Cie, Inc. as to all Counts of the Counterclaim and award it all damages sustained in connection with said Counts, including, without limitation, the attorneys' fees and costs incurred in connection with this action; and

2.  Grant all further relief deemed just and proper.

**DEFENDANT
CHARLES JACQUIN ET CIE, INC.**

By its attorneys,


   /s/ Jennifer Yen
Leigh-Ann M. Patterson Durant, BBO No. 561901
Jennifer H.B. Yen, BBO No. 650594
Juan Alexander Concepción, BBO No. 658908
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000


Dated:  September 1, 2005

**Exhibit 1**

March 26, 2004

Mark Small
CFO & Treasurer
Charles Jacquin et Cie
2663 Trenton Avenue
Philadelphia, PA   19125

Dear Mark:

### "QUOTATION FOR CHAMBORD PROMOTIONAL GIFTS & PACKAGING"

Since you are using another source for the Cocktail Shaker, we have revised the payment schedule amounts for the "Art of Cocktail" gift. I have also changed the payment date in July by two weeks because the first shipment will arrive approximately July 1st instead of Mid June.

### SALES ORDER PRICE AND PAYMENT SCHEDULE

| | |
|---|---|
| 5% Upon placing purchase order | $ 33,000.00 |
| 10% 4th Monday in July | $ 66,000.00 |
| 10% 2nd Monday in August | $ 66,000.00 |
| 2nd Monday in September | $300,000.00 |
| Balance 2nd Monday in October | $195,000.00 |

| | |
|---|---|
| 200,000 Gift Sets @ $3.30 per set price | $660,000.00 |

#### Breakdown

- Window Carton, Insert, & Flocked Tray      @      $2.20 per set
  FOB: Port of Le Harve, France
- 10" Twisted Bar Spoon w/Red Knob (Shiny finish) $
  Bar Jigger ½ x 1oz. (Shiny finish)      @      $1.10 per set
  FOB: Port of Le Harve, France

## Terms

Tooling and Prep:     Included in per set price.
Payment Terms:      Outlined above in Schedule
FOB:         Port of Le Harve, France (All Packaging)
           Port of Le Harve, France (Spoon & Jigger)
Run Allowances:      0% under/ 5% over

Lead-time & Delivery Schedule:
Packaging – 90 Days approx.
Based on Receiving PO by 3/26/04

Delivery  1/3 July 1st
     1/3 July 22nd
     Balance August 16th

Lead-time & Delivery Schedule
Promotion Items – 80 Days approx.

Delivery  ½ July 1st
     Balance August 1st

AGREED TO BY CHARLES JACQUIN ET CIE., INC: _____

                Signature of Mark Small
                CFO & Treasurer

                MARK SMALL , TREASURER/CFO
                Print Name and Title and Date  3 - 26 - 04

Sincerely,
HUB FOLDING BOX COMPANY, INC.

                USE PO 2004

Stephen Birmingham
Account Executive

SB/lc

**Exhibit 2**

FAX EMIS PAR : 33   2 54 79 17 19   SOCIETE CHAMBORD   29/88/85   14:57   Pg:   6/19
CAPITAL 3 810 000 EUROS   Siege Social Mondial   N°01001658221
82, Route de Bracieux   SWIFT ADDRESS :
BROB FR2B
FAX 02 54 79 17 19   BP 13  - La Sistière   SIRET 324 094 689 00019
41 700 COUR CHEVERNY   Tél. 02 54 79 17 06
FRANCE

*EXHIBIT 2*

# FAX

*Copie Catherine*

**MESSAGE DU : July 22nd 2004**

**A/TO :**      **Stephen Birmingham  / Lynda Cyr**
**HUB FOLDING BOX**

**DE/FROM :**      **Laetitia Queron**
**CHAMBORD & CIE**

**PAGES :**      **2**

**SUBJECT :**      **Commercial Invoice – URGENT**

**Dear Lynda, Dear Stephen,**

We would need you urgently to send us by fax TODAY the commercial invoice corresponding to the Bill of Lading you will find attached to this fax.

We desperately need this document because the container has arrived to the port and we will pay storage fees starting tomorrow if we don't send the commercial invoice.

Please send us this document urgently.

Many thanks for your help.

Kind regards,

Laetitia QUERON
Export Assistant
Tel + 33 254 79 17 16

*Laetitia Queron*

**Exhibit 3**

RCS BLOIS B 324 094 689 (82 B 56)
CAPITAL 3 810 000 EUROS

**FAX 02 54 79 17 19**

**Chambord & Cie S.A.R.L.**
Siège Social Mondial
82, Route de Bracieux
BP 13 - La Sistière
41 700 COUR CHEVERNY
FRANCE

*EXHIBIT 3*

BANQUE BRO BLOIS
N°01001658221
SWIFT ADDRESS :
BROB FR2B
SIRET 324 094 689 00019
Tél. 02 54 79 17 06

# FAX

*Copie Catherine*
*Ip Kistner*

**MESSAGE DU : July 22nd 2004**

**A/TO :**     **Stephen Birmingham / Deana Travers**
          **HUB FOLDING BOX**

**DE/FROM :**    **Laetitia Queron**
          **CHAMBORD & CIE**

**PAGES :**      1

*URGENT*

**SUBJECT :**     **SPOONS & JIGGERS**

**Dear Deana, Dear Stephen,**

Thanks for your fax dd. July 22nd to Patricia. We will wait for your answer regarding date of arrival of the second shipment of spoons / jiggers in Le Havre.

In the meantime, please make sure that the documents are correctly filled up (BOL and commercial invoice) according to my e-mail dd. July 19th. Please also let us know urgently the name of the sea freight company, contact person, telephone number and number of the container. This would help us accelerating delivery to our warehouse.

Regarding final shipment of 80,000 sets you can ship it entirely at once (no need to break it into 2 shipments). HOWEVER, please **DO NOT USE THE SAME FREIGHT FORWARDER.** We do not argue the transit time as we know that 3 weeks on the sea is normal whoever is handling the matter, **BUT,** we had many problems with them **ONCE** the shipment has arrived at the port. They were not able to deliver the 1st shipment at our warehouse, that's why we had to change to SDV SCAC. Please change freight forwarders for the last 2 shipments.

Do not hesitate to contact me should you need any further information.

Many thanks for your help.

Kind regards,

*[signature]*

Laetitia QUERON
Export Assistant
Tel + 33 254 79 17 16

**Exhibit 4**

09/01/2005  15:05  FAX  02 54 79 17 19  SUCIETE CHAMBORD  29/88/85  14:57  Pg  5/19
CAPITAL 3 810 000 EUROS  Siege Social Mondial  N°U100J658221
82, Route de Bracieux  SWIFT ADDRESS :
BROB FR2B
FAX 02 54 79 17 19  BP 13  - La Sistière  *EXHIBIT 4*  SIRET 324 094 689 000 9
41 700 COUR CHEVERNY  Tél. 02 54 79 17 06
FRANCE



# FAX

**MESSAGE DU : July 22nd 2004**

**A/TO :**     **Stephen Birmingham / Lynda Cyr**
              **HUB FOLDING BOX**

**DE/FROM :**   **Laetitia Queron**
              **CHAMBORD & CIE**

**PAGES :**     **3**

**SUBJECT :**   **SPOONS & JIGGERS 1st SHIPMENT - URGENT**

**Dear Lynda, Dear Stephen,**

Please find enclosed a copy of the commercial invoice you sent to us regarding the spoons and jiggers. Kindly be informed that this shipment arrived to the port of Le Havre on July 2nd and we will get the goods ONLY next Monday July 26th !

Indeed, we had a lot of problems with the fowarding agent VDH who was unable to do the necessary to deliver the goods. Consequently, in order to be able to get the goods one day, we were forced to change forwarders and we had to pay for the transport costs from Le Havre to our warehouse. Thus, please take this into consideration and do not pay the attached invoice entirely, but only on a CIF Le Havre basis.

Moreover, please let us know when the remaining spoons and jiggers shall be delivered. We are waiting for the second container to be delivered asap. To avoid any further problems such as we now face for the 1st shipment, please be very careful when filling the documents (please refer to my e-mail message dd. July 19th of which you will find a copy attached).

Please advise urgently. **This is very very important for us.**

Many thanks for your help.

Kind regards,

Laetitia QUERON
Export Assistant
Tel + 33 254 79 17 16

**Exhibit 5**

RCS BLOIS B 324 094 689 (82 B 56 )
CAPITAL 3 810 000 EUROS

FAX 02 54 79 17 19

**Chambord & Cie S.A.R.L.BANQUE BRO BLOIS**
Siège Social Mondial
82, Route de Bracieux
B.P. 13 - La Sistière
41 700 COUR CHEVERNY
FRANCE

N° 01001658221
SWIFT ADDRESS : CMCIFR22
SIRET 324 094 689 00019
Tel. 02 54 79 17 00

$\mathcal{E}$XHIBIT 5

FAX

MESSAGE DU:      22/09/2004
A/TO:            **MR ROBERT COOPER**                        ***TOP URGENT***
*CC :*           *MRS PEGGY DWYER*
CC               *MR STEPHEN BIRMINGHAM / HUB FOLDING BOX COMPANY INC.*

DE/FROM :        CHAMBORD & CIE SARL
                 *MR CLAUDE KISTNER*
FAX N°:          00.1 508 339 0102
PAGE :           **3**

***SUJET/SUBJECT:* UTENSILS : OUT OF STOCK STATUS**

### *DEAR ROBERT,*

*<u>Very serious problems concerning the delivery of the third consignment of Jiggers and spoons.</u>*

*On August 30th 2004, HUB sent us a fax stating that the consignment was due to reach Le Havre on SEPTEMBER 15TH ( that it had left India on August 23RD 2004 ).*

*Then, on September 15th, we receive a new fax from HUB stating that the consignment will arrive on September 18th.*

*As this evening we run out of stock of Spoons and Jiggers to produce the gift sets orders, we have been trying for days to trace this consignment. This morning, following numerous phone calls, we hear that the consignment, at best, will arrive at Le Havre port on SEPTEMBER 29TH. This means that, by the time the goods are cleared through customs and transported down here, we will have them October 1st 2004 <u>at the earliest.</u>*

*I repeat, as of end of production day today, we are OUT OF STOCK in these utensils. I ask you : what are we now to do ? We will have to cancel our schedule for shipments. This is a drastic situation.*

*Kind regards,*

***Claude KISTNER***

1

**Exhibit 6**

RCS BLOIS B 324 094 689 (82 B 56)       Chambord & Cie S.A.R.L.       BANQUE BRO BLOIS
CAPITAL 3 810 000 EUROS                 Siège Social Mondial          N° 01001658221
                                        82, Route de Bracieux         SWIFT ADDRESS : BROB FR2B
FAX 02 54 79 17 19                      B.P. 13  - La Sistière        SIRET 324 094 689 00019
                                        41 700 COUR CHEVERNY          Tél. 02 54 79 17 00
                                        *FRANCE*

**EXHIBIT 6**

MESSAGE DU:        16/08/04 / 13:03
                   MR ROBERT COOPER
                   CHARLES JACQUINS INC.
DE/FROM :          CHAMBORD & CIE SARL FRANCE
                   MR CLAUDE KISTNER
FAX N° :           00 1 215 425 94 38
PAGES:             1
SUBJECT :          GIFT SETS : THERMOFORM PLASTIC TRAY& METAL SPOON

*Dear Robert,*

*As sorry as I am to have to say it .. this disastrous saga continues......
On restarting this morning's production of 750ml gift sets, we have discovered
that the thermoform plastic trays for the 750ml have a very serious defect :
the bottom « grip » in which we normally fix ( slip / clip )  the bottom of the metal
spoon is non existent on these trays.*

*I am sure that there must be a problem in the mould but you have to look into this
with Hub in depth. As you can imagine, this means that the bottom of the spoon has
nothing to hook into at all. All those received from our warehouse for this morning's
production are the same. We are sending you a sample of the tray itself so you can
see it to believe it ! A parallel sample tray is going to Stephen Birmingham.*

*This is awful !! This was a bad enough discovery this morning but not the only one !
There are evident defects in the spoons. We are discovering that the Spoons from
India that we are receiving are not all of uniform format. There are significant
variations in width at the top, right under the « scoop » part. Certain spoons
therefore do not fit into the « grips » as securely as they should. I'm sending you two
different spoon samples in the package going to you this afternoon.*

*So, small details have huge repercussions. My heart is sinking every day now with
these serious setbacks. It is sure that our Consumers are not going to get the 100%
top quality with these gift sets which they deserve : this is all unworthy of us given
the prestige of the Chambord brand.*

*Your package will be under chronopost AWB N° :
N° :  XB 235 049 631 FR
Hub's package will be under chronopost AWB N° :
N° : XB 235 049 645 FR
Please rush advise.*

*Kind regards,*

*Claude Kistner*

